# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

NORA R. BADIE,

                          Plaintiff,

-vs-                                                  **Case No. 6:05-cv-593-Orl-KRS**

COMMISSIONER OF SOCIAL
SECURITY,

                          Defendant.

_____

## ORDER

This cause came on for consideration without oral argument on the Complaint filed by Nora R. Badie, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA).  Doc. Nos. 12, 13.  Pursuant to the consent of the parties, this matter has been referred to me for disposition under 28 U.S.C. § 636(c).  Doc. Nos. 15, 16.

## I.    PROCEDURAL  HISTORY.

In February 2002, Badie filed an application for disability benefits under Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq*, and an application under the Supplemental Security for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq*. (sometimes collectively referred to herein as the Act).  R. 65-67 (OASDI application), 306-07 (SSI application).  Both applications allege that Badie became disabled on

December 27, 2001.[1]  *Id.*  Badie's applications were denied initially and on reconsideration.  R. 54-55, 60-61, 299-304.

Badie made a timely request for a hearing before an ALJ.  R. 52.  An ALJ held a hearing on July 19, 2004.  Badie, who was represented by an attorney, testified at the hearing.  R. 308-29.  No other testimony was taken.

After considering the testimony and the medical evidence presented, on October 28, 2004, the ALJ issued a decision on Badie's applications.  R. 12-18.  The ALJ determined that Badie was insured under OASDI through the date of his decision.  R. 17.  The ALJ found that Badie had not engaged in substantial gainful activity since the alleged onset date of her disability.  *Id.*

The ALJ found that Badie had a seizure disorder and migraine headaches, which were severe impairments, but which did not meet or medically equal the Listings.  *Id.*

The ALJ found Badie's testimony about the limitations arising from her impairments was not totally credible.  Specifically, the ALJ observed that Badie testified she experienced migraine headaches two to three times per week and woke up every morning with a headache.  However, she reported to an emergency room physician that she experienced headaches only once per month.  Also, her treating physician had noted that Badie's headaches were reasonably well controlled with

---

[1]  Badie was previously found to be disabled as of December 1, 1983.  R. 39.  The SSA conducted periodic reviews to determine whether Badie remained eligible to receive benefits.  In June 2000, the SSA determined that Badie had experienced medical improvement such that she was no longer eligible for disability benefits.  Badie requested a hearing, which was held before an administrative law judge (ALJ).  *Id.* On December 26, 2001, the ALJ issued a decision finding that Badie was no longer eligible for disability benefits.  R. 39-47. Badie did not appeal this decision.  *See* R. 311.  Accordingly, the present case addresses only whether Badie was disabled after December 26, 2001.

medication.  Badie testified that she experienced two to three breakthrough or other minor seizures per week, but her treating physician had observed that her seizures were well treated with medication, and that her last medically reported seizures had occurred months apart.  Finally, the ALJ observed that statements by Badie's treating physician and by a consulting physician about the frequency of Badie's seizures appear to have been based on Badie's own statements, rather than their objective medical findings. R. 15.

The ALJ found that Badie had the following residual functional capacity (RFC): she could sit, stand, or walk for up to six hours in an eight hour workday, and could lift up to ten pounds occasionally.  R. 16.  In other words, the ALJ found that Badie retained the RFC for sedentary work.  R. 18. She was to avoid hazardous machinery and heights, but she had no other limitations. R. 16.

Based upon Social Security Ruling (SSR) 85-15, the ALJ concluded that the restriction from working around hazardous machinery and heights would still permit Badie to perform substantially all of the requirements of sedentary work.  Based on the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt P, App. 2, the ALJ concluded that there were other jobs that Badie could perform in the national economy.  Therefore, the ALJ concluded that Badie was not disabled for purposes of the Act.  R. 17.

Badie requested review of the ALJ's decision. R. 8; *see also* R. 56 (finding good cause for belated filing of request for review).  On March 3, 2005, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 4-6.  Badie timely sought review of this decision by this Court.  Doc. No. 1.

## II.      JURISDICTION.

The ALJ's decision became the final decision of the Commissioner when the Appeals

Council denied Badie's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir.

1998); 20 C.F.R. §§ 404.981, 416.1481.  Therefore, the Court has jurisdiction pursuant to 42

U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.     STATEMENT OF FACTS.

*A.      Badie's Testimony and Written Statements.*

Badie was born June 19, 1957.  R. 64, 311.  She is 5'3" tall and weighed 235 pounds at the

time of the hearing.  R. 312.

Badie graduated from high school and attended one year of college.  *Id.*  Her past work,

which was in November 2002, was as a certified nurse's assistant.  *Id.*

Badie suffered a stroke in 1979 that resulted in seizures and migraine headaches.  R. 314.

She had two kinds of seizures.  A grand mal seizure caused her to fall to the ground unconscious.

A petit mal seizure caused her to blank out for five to ten minutes and have memory loss.  R. 315,

320.  Her seizures were followed by migraine headaches.  R. 317.  She estimated that she had petit

mal seizures two or three times a week, although her last seizure was approximately two months

before the hearing, in about February 2004.  R. 315-18.

She had migraine headaches every day, with two or three severe headaches each week.  R.

317, 325.  She last sought emergency room treatment for migraines on the Saturday before the

hearing.  R. 319.  When medication was ineffective in relieving the pain, she would develop a

stomachache and sometime vomit, and have to be taken to the hospital.  R. 318, 320.  She also experienced sensitivity to light and sound.  R. 320.

She took Tegretol,[2] which reduced but did not eliminate her seizures.  R. 315.  She also took Topamax.[3]  R. 90.  She used Excedrin and a Stadol[4] pump when necessary for migraine headaches.  R. 318.  The Tegretol and Stadol made her sleepy.  R.  317, 321.

Badie lived with her mother, who was eighty years old, and who received assistance from in-home nurses.  R. 323.  Badie could cook and take care of basic household chores, but had trouble working with strong-smelling food and using strong-smelling cleaning supplies.  R. 90, 92-93, 96-98, 323-24.  She could care for herself, including bathing and dressing herself.  R. 93. During the day, Badie could watch some television and use a computer for about half-an-hour per day, but had been advised against looking at a screen for extended periods.  R. 324.

Badie had been restricted from driving more than a few blocks.  R. 322.  Family members assisted her with driving for long-distances, shopping, and other household chores.  R. 322-23. Family members also contributed money for Badie's care.  R. 325.

---

[2] Tegretol is the brand name for carbamezepine, which is used in the treatment of epilepsy and associated seizures, and occasionally in the treatment of bipolar disorder.  Medline Plus *Carbamazepine*, http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202111.html (last visited Sept. 25, 2006).

[3] Topamax is the brand name of topiramate and is used in the treatment of seizures and to prevent migraine headaches.  Medline Plus, *Topiramate (Systemic)*,http://www.nlm.nih.gov/ medlineplus/druginfo/uspdi/203085.html (last visited Sept. 25, 2006).

[4] Stadol is the brand name for butorphanol, a narcotic analgesic used in the treatment of moderate to severe pain.  As a spray, it is often used in the treatment of migraine headaches.  Medline Plus, *Butorphanol Nasal Spray*, http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a601204.html (last visited Sept. 25, 2006).

Badie estimated that she could lift forty to fifty pounds.  R. 319.  She had no problems

sitting, walking, or standing.  R. 319-20.  She associated headaches with bending and heat.  R. 92.

Badie occasionally had trouble sleeping.  R. 321.

B.      *Medical Records.*[5]

In January 1998, Badie was seen by Michael D. Kohen, M.D., following hospitalization for

pneumonia.  Dr. Kohen observed that Badie's past medical history indicated epilepsy and migraine

headaches. R. 260.

In October 1999, Badie was seen by John A. Ortolani, M.D., for continuing treatment of

her seizures.  R. 276.  Dr. Ortolani observed that Badie's seizures were controlled by Tegretol.  R.

276.  Records from Dr. Ortolani in December 1999 indicate that Badie continued to control her

seizures with Tegretol.  R. 275.

Records of treatment that appear to be from Dr. Kohen in June 2000 reflect that Badie's

migraines were controlled with Stadol.  R.  255.

 In August 2000, Dr. Ortolani observed that Badie was doing reasonably well and that

Tegretol helped with her twitches and seizures.  R. 274.

In December 2000, Dr. Ortolani observed that with weight loss, Badie had fewer problems

with seizures and other complications.  R. 272.   In February 2001, Dr. Ortolani observed that

Badie's headaches were improved with diet and that she had not had seizures recently.  R. 216.

---

[5]  Because Badie's claim arises from her seizure disorder and migraines, I will not review
medical records with respect to other ailments.

-6-

Additional records that appear to be from Dr. Kohen in January, November and December 2001 reflect that Badie had persistent headaches about five times a week.  R. 112-13, 117,  246-47, 252.  These notes also reflect complaints of seizures and migraines in May 2002.  R. 243.

Between February 2001, and June 2004, Badie sought treatment at an emergency room for migraine headaches, sometime accompanied by photophobia (light sensitivity), vision problems, nausea and vomiting.   She was typically given medication and then discharged. R. 201-03 (February 23, 2001); R. 193-95 (May 30, 2001); R. 184-86 (July 31, 2001); R. 182-83 (August 28, 2001); R. 180-81 (October 22, 2001); R. 291 (October 27, 2001); R. 164-66 (January 12, 2002, in which Badie report that she had a migraine about once a month); R. 159-63 (February 16-17, 2002); R. 157-58 (August 11, 2002); R. 153-55 (September 22, 2002); R. 284-86 (January 17, 2004); R. 291-96 (June 27, 2004); R. 284-89 (July 12, 2004).

During an emergency room visit for migraine headaches on April 15, 2001, Badie indicated that she had been seizure free for awhile.  R. 199.  In September 2001, Dr. Ortolani observed that Badie "continues to do reasonably well.  The seizures are under reasonable control. The seizures she has are minor."  However, Dr. Ortolani did observe panic attacks.  He stated, "[a]t this time I still do not feel [Badie] is capable, either emotionally or medically, of working." R. 215.

On December 28, 2001, Badie was seen by Margaret Chang, M.D., for problems unrelated to seizures and migraines.  However, Badie told Dr. Chang stated that her last seizure had been in the year 2000. R. 118.

In April 2002, Dr. Ortolani observed that Badie "still gets this brief, staring spells where she loses contact with reality two to three times a week, but the bad seizures seem to be under reasonable control . . . ." He opined that "with this frequency of the seizures, she really cannot drive and she really cannot hold down a job." He added Topamax to her treatment regimen both for seizures and headaches. R. 214.

In June 2002, Badie was seen by Jack E. Pulwers, M.D., at the request of SSA. She reported that she had seizures two to three times a week and migraine headaches two times a week, with nausea, vomiting, photophbia and hyperacusis[6]. Dr. Pulwers observed that Badie had a normal gait, that she had full range of motion in both her upper and lower extremities, and that her grip strength was 5/5 bilaterally. His impression was absence-type seizure disorder,[7] and migraine headaches with nausea and light sensitivity. R. 120-22.

In September 2002, Dr. Ortolani observed that Badie "has not had any seizures and is doing well on the Tegretol . . . ." R. 213.

In March 2003, Dr. Ortolani observed that Badie continued to have moderately severe headaches that only responded to Limbitrol, but that Limbitrol "keeps the headaches under some reasonable control." R. 271. In August 2003, Dr. Ortolani observed that Badie had had no seizures recently. R. 270.

---

[6] "Hyperacusis is the perception of an unusual auditory sensitivity to some environmental noises or tones." Vestibular Disorder Association, http://www.vestibular.org/ vestibular-disorders/specific-disorders/vestibular-hyperacusis.php (last visited Sept. 25, 2006).

[7] Absence seizures, also known as petit mal seizures, are "a temporary disturbance of brain function caused by abnormal electrical activity in the brain and characterized by abrupt, short-term lack of conscious activity ('absence') or other abnormal change in behavior." MedlinePlus, *Petit mal seizure*, http://www.nlm.nih.gov/medlineplus/ency/article/000696.htm (last visited Sept. 25, 2006).

In October 2003, Dr. Ortolani wrote a letter stating that Badie "continues to have seizures and her situation is not controlled.  This patient is disabled and incapable of working."  R. 268.  Office notes from the same day indicate that Badie "had a spell where she ended up in the hospital for a seizure.  She had a severe headache after that."  Badie requested to be continued on her existing medications.  R. 269.

In February 2004, Dr. Ortolani observed that Badie "had one minor breakthrough seizure this weekend, but she states it was related to stress and not sleeping."  He observed "[a]t this time I do not see there is anything more that needs really needs to be done.  She is happy with the Tegretol . . . [and] has done very well with this medication."  R. 267.

C.      *Reviewing Professionals.*

In July 2002, Alan G. Tetlow, M.D., completed a Physical Residual Functional Capacity Assessment at the request of SSA.  R. 125-32.  Dr. Tetlow wrote that Badie reported having one to two seizures per week, during which she remained awake.  R. 126.  However, he observed that her last recorded seizure was in 2000.  R. 127.  Accordingly, he concluded that the alleged frequency of seizures was inconsistent with the medical evidence reviewed.  R. 130. Dr. Tetlow concluded that Badie had some limitations on climbing and should avoid even moderate exposure to hazards such as machinery and heights, but that she had no other exertional, postural, manipulative, visual, communicative, or environmental limitations.  R. 125-32.

Another Physical Residual Functional Capacity Assessment prepared in December 2002 by Eric C. Puestow, M.D., came to substantially the same conclusions.  R. 204-11.  Dr. Puestow observed that Badie's seizures appeared well controlled.  R. 209.  Because of seizures, he

concluded that she should never climb ladders, ropes or scaffolds and should avoid concentrated exposure to hazards.  R. 206, 208.  Otherwise, he concluded that Badie had no exertional, postural, manipulative, visual, communicative, or environmental limitations.

## IV.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3); 42 U.S.C. § 1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

          (5) Is the claimant unable to perform any other work within the
          economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  An affirmative answer to any of the above questions
leads to either the next question, or, on steps three and five, to a finding of disability.  A negative
answer leads to a finding of "not disabled."  *See, e.g., McDaniel v. Bowen*, 800 F.2d 1026, 1030
(11th Cir. 1987) (per curiam).

     "The burden is primarily on the claimant to prove that he is disabled, and therefore entitled
to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir.
2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the
Commissioner[,] . . . [who] must produce evidence that there is other work available in significant
numbers in the national economy that the claimant has the capacity to perform."  *Id*. at 1278 n.2
(citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

     A court's review of a final decision by the SSA is limited to determining whether the
ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206,
1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*,
847 F.2d 698, 701 (11th Cir. 1988).

     The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C.
§ 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do
more than create a suspicion of the existence of the fact to be established.  It means such relevant
evidence as a reasonable mind might accept as adequate to support a conclusion."  *Walden v.
Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).  Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

## V.    ANALYSIS.

Badie asserts two grounds supporting reversal.  First, that the ALJ erred by failing to solicit the testimony of a vocational expert (VE) at step five of the sequential evaluation process. Second, that the ALJ improperly discredited Badie's testimony.  These are the only issues I will address.[8]

---

[8] The parties were advised that issues not specifically raised would be waived.  Doc. No. 14 at 2.

A.      Need for a VE at Step Five of the Evaluation Process.

Badie contends that when, as here, an ALJ finds that the claimant has nonexertional

impairments that limit the ability to work at a given exertional level, the ALJ must call upon a VE

to assess whether there is work that the claimant can perform that is available in the national

economy.  The Commissioner contends that use of a VE is not necessary when, as here, the ALJ

relied upon a Social Security Ruling to determine that the nonexertional limitations did not

significantly limit the claimant's basic work activities.

Before the Grids were promulgated in 1979, the preferred method of determining whether

there was work available that a social security claimant could perform was through the testimony

of a VE.  *See Cowart v. Schweiker*, 662 F.2d 731, 736 (11th Cir. 1981).  After the United States

Supreme Court approved use of the Grids in appropriate cases, *see Heckler v. Campbell*, 465 U.S.

458 (1983), three-judge panels in the Eleventh Circuit began to address whether the Grids could be

relied upon at step five of the sequential evaluation process when the claimant had nonexertional

impairments that limited his work skills.

The law that developed in this circuit requires that the ALJ initially determine whether the

claimant's alleged nonexertional impairments limit the ability to work; if they do not, then

exclusive reliance on the Grids at step five of the evaluation process is appropriate. *See Reeves v.

Heckler*, 734 F.2d 519 (11th Cir. 1984)(citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d

524, 537 (6th Cir. 1981); *see also Broz v. Schweiker*, 677 F.2d 1351, 1363 (11th Cir.

1982)(remanding for consideration whether a claimant's nonexertional impairments significantly

limited his basic work skills, and then, whether the Grids could be used), *vacated, Heckler v. Broz*,

-13-

461 U.S. 952 (1983), *adhered to on remand, Broz v. Schweiker*, 711 F.2d 957 (11th Cir.), *modified in other respects*, 721 F.2d 1292 (11th Cir. 1983). However, if the ALJ finds that the claimant's nonexertional impairments significantly limit the claimant's basic work skills, otherwise stated as precluding the wide range of work at a given exertional level, then exclusive reliance on the Grids is not permitted. *See Phillips v. Barnhart*, 357 F.3d 1232, 1242 (11th Cir. 2004) (citing Francis *v. Heckler*, 749 F.2d 1562, 1567 (11th Cir. 1985)). Rather, the ALJ must turn to VE testimony regarding the specific jobs that the claimant can perform in light of the claimant's functional capacity. *See id.* at 1243; *Welch v. Bowen*, 854 F.2d 436, 439-40 (11th Cir. 1988); *Gibson v. Heckler*, 762 F.2d 1516, 1521-22 (11th Cir. 1985).

The ALJ's decision that nonexertional impairments do not significantly limit basic work skills (that is, do not preclude a wide range work at a given exertional level) must be supported by substantial evidence in the record. For example, in *Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989), the ALJ found that the claimant had nonexertional impairments arising from borderline intellectual functioning and a dysthymic disorder that precluded her from performing complex tasks and working under extraordinary stress. The ALJ concluded that these nonexertional limitations only slightly diminished the claimant's capacity to perform light work and relied upon the Grids to conclude that there was work available the claimant could perform. The Eleventh Circuit reversed the decision, holding that use of the Grids was inappropriate. The Court explained as follows: "Absent testimony from a vocational expert, the ALJ's conclusion that appellant's mental limitations do not significantly compromise her basic work skills or are not

-14-

severe enough to preclude her from performing a wide range of light work is not supported by substantial evidence." *Id.* at 1202.

Similarly, in *Marbury v. Sullivan*, 957 F.2d 837 (11th Cir. 1992), the ALJ found that the claimant had a seizure disorder that resulted in a nonexertional impairment limiting his ability to work around unprotected heights or hazardous machinery. The ALJ concluded that these nonexertional limitations did not reduce the range of light work available to the claimant. The court reversed this decision, emphasizing that "'it is only when the claimant can clearly do unlimited types of light work, . . . that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy." *Id.* at 839 (quoting *Allen v. Sullivan,* 880 F.2d 1200, 1202 (11th Cir. 1989), and *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. Unit A March 1981)).

In the present case, the ALJ relied upon SSR 85-15 to conclude that Badie's inability to work around hazards did not significantly limit  Badie's ability to perform sedentary work. I have not found any Eleventh Circuit decision in which the court approved reliance on a Social Security Ruling, without other evidence, to support such a finding. Under the law discussed above, the rule in this circuit appears to be that when the ALJ finds that nonexertional impairments exist, VE testimony is necessary to support an ALJ's conclusion that those nonexertional impairments do not significantly limit basic work skills. *See, e.g.*, *Marbury*, 957 F.2d at 839.

Accordingly, remand is required to permit the Commissioner to obtain VE testimony to determine whether Badie's nonexertional limitations significantly limit her ability to perform sedentary work. If they do, then exclusive reliance on the Grids is improper.

>    B.      *Credibility.*

Badie contends that the ALJ failed properly to consider her subjective complaints regarding the frequency and severity of her seizures and headaches.

In this circuit, a claimant's assertion of disability through testimony of pain or other subjective symptoms is evaluated pursuant to a three-part standard.  This standard "'requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'"  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.1991)).  If proof of a disability is based upon subjective evidence and a credibility determination is critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote*, 67 F.3d at 1562.

Here, the ALJ concluded that Badie's testimony regarding the frequency and severity of her seizures and headaches was not fully credible.  Specifically, the ALJ observed that Badie testified she experienced migraine headaches two to three times per week and woke up every morning with a headache.  He relied upon the following evidence in support of his conclusion that Badie's testimony was not fully credible: (1) she reported to an emergency room physician on January 12, 2002, that she experienced headaches only once per month; (2) that Dr. Ortolani reported in March 2003 that Badie's headaches were well controlled with medication; (3) that Dr. Ortolani observed in September 2002 that Badie was not having seizures and in August 2003 that her seizures were

-16-

controlled with medication; and (4) that statements by Drs. Pulwers and Ortolani about the frequency of Badie's seizures were based on Badie's own statements, rather than objective medical findings.

While each of the reasons given by the ALJ has evidentiary support in the record, these isolated statements are considered out of context of the record as a whole.  In October 2003, Dr. Ortolani, Badie's treating physician, reported that Badie had recently suffered a seizure for which she was hospitalized and that her condition was not well controlled.  Badie continued to seek emergency room treatment for migraine headaches she could not treat on her own through 2004. These are objective events, not simply Badie's subjective complaints, that support Dr. Ortolani's opinion that Badie's seizures and headaches were not well controlled.  Because the opinion of a treating physician must be given considerable weight, *see Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997), on remand the Commissioner should reassess Badie's complaints of functional limitations arising from both her seizures and her migraine headaches.

> C.     *Award of Benefits or Remand.*

Badie requests that the Court order the Commissioner to pay her disability benefits.  A court may order an award of benefits "where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997).  Here, the record does not establish disability without any doubt.  Rather, remand is required to permit the Commissioner to reassess the affect of Badie's documented migraine headaches and seizure would have on her ability to perform a

wide range of sedentary work.  If the Commissioner concludes that the functional limitations arising from these impairments significantly limit Badie's basic work skills, she may not rely upon the Grids to determine disability at step five of the sequential evaluation.

**VI.     CONCLUSION.**

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** under sentence four of 42 U.S.C. § 405(g) for further proceedings.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on September 25, 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

-18-